Kardas v Union Carbide Corp. (2004 NY Slip Op 50163(U))

[*1]

Kardas v Union Carbide Corp.

2004 NY Slip Op 50163(U)

Decided on March 25, 2004

Supreme Court, Westchester County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 25, 2004

Supreme Court, Westchester County
 AMBER-ANN LOUISE KARDAS, et al., (ASHLEY THIBAULT), Plaintiffs,
against
UNION CARBIDE CORPORATION, et al., Defendants.
Index No.: 9011/00

Steven J. Phillips, Esq.
Levy Phillips & Konigsberg, LLP
Attorneys for Plaintiffs
800 Third Avenue New York, New York 10022
Thomas E. Reidy, Esq.
Ward Norris Heller & Reidy
Attorneys for Moving Defendants
Shipley Company LLC, Union Carbide Corporation, KTI Chemicals Inc.,
CNA Holdings, Inc. f/k/a Hoechst Celanese Corporation and G.J. Chemical Company, 300 State Street, Rochester, New York 14614
Michael J. Templeton, Esq.
Jones Day
Attorneys for Moving Defendant
International Business Machines Corporation, 222 East 41st Street, 4th Floor, New York, New York 10017

JOAN B. LEFKOWITZ, J.
In Ruffing (Pfleging) v. Union Carbide Corp. (1 A.D.3d 339 [2d Dept. 2003] [hereinafter "Pfleging"]), in another of the cases in this complex toxic tort litigation, the Appellate Division, Second Department, held that an infant was not entitled to serve an amended complaint because "[it] fail[ed] to state a cognizable cause of action against [her father's employer] under either common-law negligence or strict products liability", where her proposed amended complaint:
"... essentially allege[d] that [her father] carried out of the workplace and surrounding area hazardous substances on his clothing and within his body to which his wife and daughter in utero were exposed". (Id., 1 A.D.3d, at 341).
Relying upon this decision, the remaining defendants sued by Ashley Thibault, an infant plaintiff (hereinafter "plaintiff") who asserts causes of action similar to those involved in Pfleging, move [*2]for
the dismissal of each of those claims for failure to state a cause of action, or alternatively, for summary judgment dismissing those claims.[FN1] Because this Court concludes that under controlling conflicts of law principles the law to be applied on these motions with respect to plaintiff's claims of common-law negligence, strict products liability and assumption of duty is that of the State of Vermont, and not that of New York, those causes of action survive defendants' challenges.[FN2]
I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUNDPlaintiff's father, Jon Thibault, was employed by defendant International Business Machines Corporation (IBM) at its Essex Junction facility in Vermont from 1984 through the time of her birth in 1987. During that time Mr. Thibault worked in a "clean room", i.e., a part of the facility where semiconductors were manufactured. The manufacturing process required Mr. Thibault to use and be exposed to numerous chemicals, many of which have been found to be actually or potentially harmful to humans (the causation chemicals). Some of these chemicals were manufactured by IBM for its own use, while others were manufactured and then sold to IBM by several other companies, including defendants Shipley Company LLC, Union Carbide Corporation, KTI Chemicals Inc., CNA Holdings, Inc. f/k/a Hoechst Celanese Corporation, and G.J. Chemical Company (collectively hereinafter "the Supplier Defendants").[FN3]
During plaintiff's gestation period, her father was exposed to the causation chemicals on a daily basis by inhaling them and through contact with his skin and clothing. His wife was then [*3]exposed to them through her washing of her husband's clothing and by engaging in sexual relations with him, which, according to plaintiff, "caused Mr. Thibault's toxin-contaminated sperm and semen to be introduced repeatedly into the body of [plaintiff's] mother, affecting the tissue in which [plaintiff] was implanted and attacking [plaintiff] in her embryonic and foetal state" (Pl. Mem., p.3).
Upon plaintiff's birth on October 6, 1987 she was diagnosed as suffering from numerous serious birth defects which, in sum, have left her with "profound brain damage", requiring constant care for the remainder of her life.[FN4] Many years later she joined approximately two hundred other IBM employees and their children in suing the Supplier Defendants and IBM (collectively hereinafter "defendants"), claiming a variety of injuries allegedly caused by exposure to the causation chemicals.[FN5]
Among the plaintiffs who brought suit was Alyssa Pfleging (Ms. Pfleging), whose claims were included in the complaint filed under the caption Ruffing et al. v. Union Carbide et al. (hereinafter "the Ruffing complaint"). In that complaint Ms. Pfleging brought causes of action sounding in negligence and strict products liability, based upon allegations of, inter alia, defective design, manufacture and testing of the causation chemicals, failure to warn, improper training, and inadequate safety equipment and ventilation. Ms. Pfleging's lawsuit was founded upon the central claim that she was injured as a result of exposure to certain of the causation chemicals while she was in utero, and that the manner of her exposure was her mother's laundering of her father's clothing and her parents' sexual relations during the period of Ms. Pfleging's gestation (hereinafter "male-mediated off-site exposure").
On July 12, 2000 Mr. Thibault commenced this lawsuit, individually and on behalf of his daughter, along with other plaintiffs, by filing a complaint under the caption Kardas et al. v. Union Carbide et al. (the Kardas complaint). In the Kardas complaint, he and plaintiff asserted causes of action against IBM and the Supplier Defendants for negligence, strict products liability, [*4]breach of warranty, ultrahazardous activity, fraudulent concealment and misrepresentation, and enterprise liability. Like Ms. Pfleging, plaintiff at bar contends that her injuries were the result of male-mediated off-site exposure to the causation chemicals.
In 1998 dismissal motions were filed against the Ruffing complaint and other complaints brought by other plaintiffs in this litigation. By decision and order entered October 19, 1998 (the 1998 Order), Justice Francis A. Nicolai dismissed the ultrahazardous activity causes of action as against the Supplier Defendants and the fraudulent concealment and misrepresentation claims against all defendants. Although Justice Nicolai denied the motion to dismiss the enterprise liability claims as premature, and observed that such a cause of action does not exist under New York law, he recognized that the suing plaintiffs would be entitled to recover on a "concerted action liability theory" if they "can show that the defendants agreed to commit a tortuous [sic] act which resulted in [plaintiffs'] injuries" (Reidy Affid., Exh.D, p.16).
Subsequently, the parties executed a series of stipulations which applied the 1998 Order to all pending complaints, including the later-filed Kardas complaint. As a consequence, the only causes of action set forth in the Kardas complaint that apparently remained were those sounding in negligence, strict products liability, breach of warranty, ultrahazardous activity and concerted action. However, in a bill of particulars served by plaintiff at bar on August 15, 2002 (the Preliminary BOP), plaintiff made several allegations against IBM concerning internal policies and practices that it adopted which were purportedly aimed at the protection of its employees from harm resulting from exposure to certain of the causation chemicals.
During the course of the litigation, the claims of both Ms. Pfleging and her father were dismissed as time-barred. In an effort to revive her own claims, Ms. Pfleging moved to amend her complaint against IBM to rely upon the more favorable accrual of action provisions found in Section 9658 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 USC §9601 et seq. [hereinafter "CERCLA"]).[FN6] In a decision and order entered on August 13, 2002 (the Pfleging motion order), Justice John P. DiBlasi denied that motion based upon his conclusion that CERCLA did not apply to the male-mediated off-site exposures which underlay Ms. Pfleging's claims.
Ms. Pfleging appealed the Pfleging motion order. Although the central issues raised on that appeal related to the application of CERCLA and the timeliness of Ms. Pfleging's lawsuit, in IBM's opposition brief and Ms. Pfleging's reply brief the parties addressed, to some extent, the sufficiency of her claims. Among the arguments presented by Ms. Pfleging was that she had a valid negligence cause of action based upon her allegation that by virtue of IBM's policies and practices related to the use of certain of the causation chemicals, that defendant had assumed a duty toward her which it subsequently breached.
The Appellate Division did not reach the CERCLA issue in deciding Ms. Pfleging's appeal. Instead, as noted above, in its November 3, 2003 decision it determined that even if CERCLA applied, her proposed amended complaint 'fail[ed] to state a cognizable cause of action against IBM under either common-law negligence or strict products liability" (Ruffing [Pfleging] v. Union Carbide Corp., supra, 1 A.D.3d, at 341). In doing so, it cited its decision in [*5]Widera v. Ettco Wire & Cable Corp. (204 A.D.2d 306,307 [2d Dept. 1994], lv. denied 85 N.Y.2d 804 [1995]), a case in which that same court held that an infant failed to state a negligence cause of action where her claim was that she was injured in utero by exposure to chemicals which resulted from her then-pregnant mother's laundering of her father's work clothes.
Following the decision in Pfleging, this Court was presented with a motion by certain of the defendants who sought dismissal of plaintiff's claims for preconception tort. In its decision and order entered January 12, 2004 (the January 2004 Order), this Court ruled that Vermont law governed in this case based upon its consideration of "the grouping of contacts and interest analysis approach to choice of law problems in personal injury cases" (Kardas v. Union Carbide, NYLJ 2/13/04, p.20, col.1 [Sup. Ct. Westchester Co.]). Because Vermont law was "silent on the question of recovery for preconception torts", this Court assumed that Vermont's common law is the same as this State's, and held that no cause of action for preconception tort exists (ibid.). The effect of the January 2004 Order was to leave plaintiff only with her causes of action related to in utero exposure to the causation chemicals.
With the case of plaintiff at bar now awaiting trial, IBM and the Supplier Defendants have filed separate motions seeking dismissal of the complaint pursuant to CPLR 3211(a)(7) and summary judgment dismissing her remaining causes of action. In sum, it is their position that Pfleging compels the conclusion that each of plaintiff's remaining claims fails to state a cause of action recognized in this State.
II. DISCUSSION
Seeking to avoid the avoid the application of Pfleging to the issues raised on defendants' motions, plaintiff takes a four-prong approach. First, she argues that the law of the State of Vermont controls in this case, and that her claims are recognized in that State. Second, she contends that even if New York law applies, Pfleging does not govern her causes of action because they are distinguishable from those that had been asserted by Ms. Pfleging. Third, she maintains that this Court should not follow Pfleging because, inter alia, it is contrary to the law of this State and is, in fact, unconstitutional. Finally, she asks that if the Court determines that Pfleging is controlling, it reserve judgment on the motions until her appeal from that decision has been heard by this State's highest Court. As discussed below, the Court agrees with plaintiff that several of her claims are governed by the law of the State of Vermont.
A. THE REMAINING CLAIMS
Before reaching the issues related to the sufficiency of her causes of action, the Court must determine which claims remain following the earlier motion practice and the application of the 1998 Order to the Kardas complaint. This is necessary because plaintiff's recitation of her surviving claims is disputed by defendants.[FN7]
According to plaintiff, her complaint "expressly states claims based on 'negligence,' 'strict products liability,' 'breach of warranty,' 'failure to warn,' 'abnormally dangerous and ultra hazardous activity,' 'fraudulent concealment and misrepresentation['] and[] [']enterprise liability,'" (Phillips Affid., p.24). She further asserts that she "ha[s] supplemented the allegations of [her] complaint with the[] Preliminary Bill of Particulars [] , in which [she] amplif[ies] on [*6][her] claim that defendants voluntarily assumed, and then breached, a duty to [her] by forming and publishing corporate policies, instructions and advisories for the purpose of protecting workers and their children from toxic injury, but then breached the policies and procedures which they themselves had devised, ... ." (Ibid.).
Although plaintiff makes repeated references to her fraud claims in her papers opposing these motions, she concedes that these claims were previously dismissed. Even absent that concession, it is beyond dispute that the 1998 Order dismissed the causes of action for "fraudulent concealment and misrepresentation" as against all defendants.[FN8]
To the extent that plaintiff maintains that her complaint states causes of action against all defendants for "abnormally dangerous and ultrahazardous activity", she is only partially correct. The 1998 Order clearly dismissed those claims "as to all the defendants, except IBM" (Reidy Affid., Exh.D, p.16). Thus, it is solely against IBM that this cause of action remains in this lawsuit.
Next, the sharpest dispute between the two sides of this action concerning the remaining causes of action relates to the existence of a claim for "assumption of duty". In plaintiff's view, this cause of action has been asserted against all defendants, and is supported by specific allegations in the Preliminary BOP which she cites. For their part, the Supplier Defendants argue that no such claims have been put forth against them in either the complaint or the Preliminary BOP. IBM takes a similar position, contending that no breach of an assumed duty has been alleged.
As an initial matter, a review of the Kardas complaint supports defendants' view that it contains no allegations that any of them assumed a duty toward plaintiff. Their contention that this defeats plaintiff's assumption of duty cause of action, however, is unpersuasive. Where, as here, there is a challenge to the sufficiency of a claim, "extrinsic material such as the bill of particulars ... may be considered in determining whether plaintiff has a 'potentially meritorious' cause of action" (Huyler v. Rose, 88 A.D.2d 755,755 [4th Dept. 1982], appeal dismissed 57 N.Y.2d 777 [1982]).
In the Preliminary BOP, plaintiff has specifically stated that IBM "failed to follow its own Corporate Instructions, Medical Policies, Advisories and Corporate Policies respecting worker safety and the control of reproductive and developmental toxins" (Phillips Affid., Exh.83, p.2). Additionally, she has alleged therein that "IBM improperly failed to conduct personal exposure monitoring for airborne toxic chemical exposures, and failed to conduct any personal exposure monitoring for airborne toxic chemical exposure for Jon Thibault" (ibid.). Further, she has claimed that IBM's safe exposure limits for certain of the causation chemicals were "wholly inadequate to protect against reproductive and developmental hazards" and that the assurances that IBM gave to its workers concerning the safety of those limits "were grossly inappropriate and unjustified" (id., p.3). Taken together with the IBM records submitted as exhibits to the [*7]affidavit of her attorney in opposition to the motions, which demonstrate the particular policies and practices adopted by IBM for the protection of its workers, these allegations are sufficient to demonstrate that plaintiff has stated a cause of action for assumption of duty against IBM, such that this cause of action remains in this case (see, Leon v. Martinez, 84 N.Y.2d 83,88 [1994] ["In assessing a motion under CPLR 3211[a][7], however, a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint"]).
A contrary conclusion is reached with respect to the Supplier Defendants. Notwithstanding plaintiff's effort to include them within the scope of the assumption of duty claim that she has put forth against IBM, nowhere in the Preliminary BOP does she make any allegations concerning the adoption of employee-protection policies or practices by any of those defendants. Nor does she offer any proof of the existence of any such policies. At most, she has shown that a single Supplier Defendant, Union Carbide Corporation, created certain policies to protect its own employees. Wholly absent, however, is any showing that this policy applied to the employees of any other company, and in particular, the employees of one of its customers, such as IBM. Because, even considering the contents of the Preliminary BOP and the papers submitted in opposition to these motions, plaintiff has failed to allege facts sufficient to demonstrate that she has a meritorious cause of action against any of the Supplier Defendants for breach of a duty assumed by them, no such claim exists against those defendants in this action.
In sum, the claims remaining in the action against all defendants, as determined above or not disputed by the parties, are those for negligence, strict products liability [FN9], breach of warranty and enterprise liability [FN10]. Additionally, there are causes of action remaining against IBM alone for ultrahazardous activity [FN11] and assumption of duty. Thus, it is those claims which are to be considered on these motions.
B. THE GOVERNING LAWIn this case, plaintiff is a Vermont domiciliary who was allegedly injured in that State as a [*8]result of tortious conduct committed there by each of the defendants. For reasons which are without relevance to these motions, she elected to join other plaintiffs in commencing her lawsuit in New York, where IBM maintains its principal place of business. Because the situs of the tortious conduct and her resulting injuries is other than the forum state, the first question to be determined is whether the law of Vermont or that of New York is to be applied in deciding these motions. After resolving that issue, the Court must then apply that state's law in determining whether plaintiff's claims survive defendants' motions.
In determining which state's law applies when there is a conflict of laws, it is clear that it is New York's choice of law rules which govern (Padula v. Lilarn Properties Corp., 84 N.Y.2d 519,521 [1994]). Under those rules, once a conflict is demonstrated, the trial court applies an "interest analysis", in which "'[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and * * * the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict'" (Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189,197 [1985], quoting Miller v. Miller, 22 N.Y.2d 12,15-16 [1968]).
Where, as here, the purportedly conflicting rules "involve the appropriate standards of conduct", it is "the law of the place of the tort [which] 'will usually have a predominant, if not exclusive, concern'" (Schultz v. Boy Scouts of America, Inc., supra, 65 N.Y.2d, at 198, quoting Babcock v. Jackson, 12 N.Y.2d 473,483 [1963]).[FN12] Under that standard, since the tortious conduct, consisting of the delivery of the causation chemicals into the state and the exposure of the plaintiff in utero, took place in Vermont, if that State's law conflicts with that of New York, it is Vermont's law that applies (see, Schultz v. Boy Scouts of America, Inc., supra, 65 N.Y.2d, at 198 [Law of place of tort should be applied because "[that] jurisdiction's interests in protecting [*9]the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance"]).[FN13]
That analysis, however, is only conducted if a conflict is apparent (see, Matter of Allstate Insurance Co. [Stolarz New Jersey Mfrs. Ins. Co.], 81 N.Y.2d 219,223 [1993] ["The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved"]; see also, Elson v. Defren, 283 A.D.2d 109, 114 [1st Dept. 2001] ["Where no conflict exists between the laws of the jurisdictions involved, there is no reason to engage in a choice of law analysis"]). Because it is plaintiff who seeks the application of the law of Vermont, it is her burden to prove that State's law and the existence of a conflict with the law of New York (see, Portanova v. Trump Taj Mahal Associates, 270 A.D.2d 757,759-760 [3d Dept. 2000], lv. denied 95 N.Y.2d 765 [2000]).
In the absence of proof of a conflict, the law of the forum state controls (Brandstetter v. USAA Casualty Insurance Co., 163 A.D.2d 349,350 [2d Dept. 1990], appeal dismissed in part, denied in part 78 N.Y.2d 1027 [1991]). For that reason, before determining that this Court should, in fact, apply Vermont law on defendants' motions, it must examine the law as presented by plaintiff as to each of her remaining causes of action (Falcigno v. Tesel, 2003 WL 105349, at *2 [Sup. Ct. N.Y. Co. 2003] ["Th[e] [conflict] analysis depends on the cause of action, and thus, the court will decide which state's law applies, if necessary, as it analyzes each cause of action"]; see, Padula v. Lilarn Properties Corp., supra, 84 N.Y.2d, at 521, quoting Schultz v. Boy Scouts of America, Inc., supra, 65 N.Y.2d, at 197 [Interest analysis "is determined by an [*10]evaluation of the 'facts or contacts which ... relate to the purpose of the particular law in conflict'"] [emphasis added]).
1. NEGLIGENCE AND STRICT PRODUCTS LIABILITY
As a result of the decision in Pfleging, it is New York's law that a male-mediated off-site exposure of a fetus to a toxic substance, such as is alleged to have occurred in this case, does not support either a common-law negligence or strict products liability claim as a matter of law (Ruffing [Pfleging] v. Union Carbide Corp., supra, 1 A.D.3d, at 341). Absent the overruling of that decision by our Court of Appeals, or a change of view by the Appellate Division, Second Department, the Pfeging holding is binding upon this Court, which sits in the Second Judicial Department (Mountain View Coach Lines, Inc. v. Storms, 102 A.D.2d 663,664 [2d Dept. 1984] ["[T]he doctrine of stare decisis requires trial courts in this department to follow precedents set by the Appellate Division of another department until the Court of Appeals or this court pronounces a contrary rule"]; People v. Towndrow, 187 A.D.2d 194,195 [4th Dept. 1993], appeal dismissed 81 N.Y.2d 1021 [1993] ["It should hardly need to be stated that trial courts are bound to follow the holdings of the Appellate Division"]), and must be applied on defendants' motions if plaintiff at bar cannot demonstrate that Vermont law differs from that of this State (Gangel v. DeGroot, 41 N.Y.2d 840,842 [1977] ["[I]n the absence of proof of contrary applicable foreign law, the law of the forum should be applied"]).
Seeking to avoid the application of Pfleging and to save her negligence and strict products liability claims from dismissal, plaintiff argues that while the Pfleging Court held these causes of action to be not "cognizable" in New York, Vermont does recognize such causes of action when based upon claims of in utero injuries. In support of her position that damages for prenatal injuries are generally recoverable, she relies upon Cavanaugh v. Abbott Laboratories (145 Vt. 516, 496 A.2d 154 [1985]) and Vaillancourt v. Medical Center Hospital of Vermont, Inc. (139 Vt. 138, 425 A.2d 92 [1980]), two cases which involved issues arising from in utero injuries. 
In Cavanaugh, the plaintiff was the daughter of a woman who, at the direction of a physician, ingested the drug diethylstilbestrol (DES) while she was pregnant and carrying the plaintiff. Defendants were manufacturers of that drug. The issue considered by Vermont's Supreme Court was whether it should "jettison" an earlier rule which set the accrual date of a personal injury cause of action as the time of the last negligent act attributable to the defendant (Cavanaugh v. Abbott Laboratories, supra, 145 Vt., at 519,522, 496 A.2d, at 157,158). Although it overruled its earlier precedent and adopted an accrual rule based upon plaintiff's discovery of her injuries, contrary to the assertion of plaintiff at bar, that Court neither "reconfirmed the existence of liability for in utero torts" (Pl. Mem., p.14 [italics in original]), nor even addressed the sufficiency of such a claim.
Unlike Cavanaugh, in Vaillancourt there was a challenge raised as to the sufficiency of a cause of action for injury to a child in utero. Therein, plaintiffs sued upon a claim of medical malpractice based upon the failure to provide proper care to a woman undergoing labor at a hospital, which resulted in the death of the unborn child. In finding that plaintiffs had stated a cognizable wrongful death cause of action, that State's high Court held that a viable fetus, though later stillborn, was a "person" under Vermont's wrongful death statute.
More importantly for the purposes of the issues raised on the instant motions, in [*11]Vaillancourt the Vermont Supreme Court declared that: "Rights of an unborn child are no stranger to our law", and cited several statutory examples of rights extended to stillborn children and fetuses (Vaillancourt v. Medical Center Hospital of Vermont, Inc., supra, 139 Vt., at 141, 425 A.2d, at 94 [e.g., Under 18 V.S.A. § 5231[b], the definition section of the Uniform Anatomical Gift Act, the term "decedent" includes a stillborn infant or fetus]). In addition, in setting forth its reasons for holding that a wrongful death claim may be asserted for a viable fetus which is later stillborn as a result of tortious conduct, that Court included the concern that "[i]f no right of action is allowed, there is a wrong inflicted for which there is no remedy" (id., 139 Vt., at 142, 425 A.2d, at 94). This exposition of the underlying bases for Vermont's recognition that tortious conduct causing in utero harm will generally give rise to a cause in action supports plaintiff's contention that under that State's law, her common-law negligence and strict products liability claims are legally viable.
Defendants, of course, present a more limited view of the state of the law as it currently exists in Vermont. Specifically, it is their position that New York and Vermont law are not in conflict with respect to their treatment of in utero torts in general, and that while New York's law on the viability of plaintiff's negligence and strict products liability causes of action is settled by Pfleging, Vermont has simply not addressed the issue of in utero harm caused by a male-mediated off-site exposure. Building upon that view, defendants maintain that this Court must adhere to the rule that "[a]bsent a detailed presentation of those portions of [the foreign] law claimed to be applicable the court could assume that [the foreign] law was similar to New York law" (McCarthy v. Coldway Food Express Co., 90 A.D.2d 459,461 [1st Dept. 1982]).
It is true that like Vermont, New York recognizes the existence of negligence and strict products liability causes of action for in utero injuries under certain circumstances (Nieves v. Montefiore Medical Center, 305 A.D.2d 161,164 [1st Dept. 2003] ["A claim may properly be made on behalf of an infant for injuries allegedly sustained in utero or due to premature birth attributed to defendants' malpractice in their prenatal care of the infant plaintiff's mother"]; Hymowitz v. Eli Lilly & Co., 73 N.Y.2d 487,502 [1989] [Applying market share liability theory to claims of in utero injury caused by DES ingestion by mothers of injured plaintiffs]). Thus, it is evident that no conflict exists between the laws of the two jurisdictions as relates to in utero claims generally, since in both States a negligence or strict products liability claim may be asserted when it is based upon tortious conduct directed at the infant's mother.
Here, however, the relevant question is what is the law of the State of Vermont as it relates to a claim of harm resulting from tortious conduct, i.e., exposure to deleterious chemicals, directed at the infant's father, which only indirectly harmed the infant, in utero, through a second exposure resulting from the parents' sexual relations or the mother's contact with the father's work clothing, during the period of pregnancy. As to this type of indirect or secondary tortious conduct, Pfleging has held that no duty to the unborn child exists. It is evident from the Court's citation of Widera that the Pfleging holding reflects the same policy concerns for creating "an almost infinite universe of potential plaintiffs" that was relied upon in Widera for finding that no duty existed in a male-mediated off-site exposure setting.[FN14]
[*12]
In defendants' view, Vermont's Supreme Court has likewise approached the extension of tort law protection with a consideration of policy factors such as the breadth of the class of potential plaintiffs that will result from recognition of novel liability theories. By way of example, they offer Smith v. Parrott (2003 VT. 64, 833 A.2d 843 [2003]), where, addressing the question of whether Vermont's medical malpractice statute should be expanded to include the "loss of chance" doctrine, that State's high Court explained that:
 "Although some of the arguments in favor of the loss of chance doctrine are appealing, we are mindful ... about the overall societal costs which may result from awarding damages to an entirely new class of plaintiffs who formerly had no claim under the common law in this state. * * * In short, we are persuaded that the decision to expand the definition of causation and thus the potential liability of the medical profession in Vermont 'involves significant and far-reaching policy concerns' more properly left to the Legislature, where hearings may be held, data collected, and competing interests heard before a wise decision is reached." (Id., 833 A.2d, at 848 [emphasis added]).
According to defendants, Smith and other cases cited by them constitute proof that in many instances "the Vermont Supreme Court and legislature have refused to expand Vermont tort law to provide a remedy to an injured plaintiff" (Supplier Def. Reply Mem., p.18).
Certainly, as demonstrated by the approach taken in Smith, Vermont's high Court has not hesitated to rely upon the potential for creating an unlimited class of plaintiffs in determining whether to expand tort protection under the laws of that State. That, however, does not compel the conclusion that such an approach would be followed with respect to a determination of whether a duty exists to protect unborn children from male-mediated off-site exposures to toxic substances. To the contrary, given that Vermont recognizes, in broad terms, that those injured while in utero should find a remedy (see, Vaillancourt v. Medical Center Hospital of Vermont, Inc., supra, 139 Vt., at 142, 425 A.2d, at 94), this Court rejects defendants' position and agrees with plaintiff at bar that under that State's law her causes of action for common-law negligence and strict products liability are recognized.
Moreover, that Vermont would extend its tort law protection to unborn children in the circumstances involved at bar is understandable to this Court, notwithstanding that it is bound to apply Pfleging in any case where New York law controls (cf., People v. Munoz, 40 A.D.2d 337,338 [1st Dept. 1973], affd. 33 N.Y.2d 998 [1974] ["Until a change in the law is made by the [*13]higher courts, we are bound by the law as it exists now, and if it results in guilty persons escaping punishment, that is unfortunate, but, beyond our power to remedy, unless we were to treat binding precedents with disdain"]). Certainly, a valid argument may be offered that injuries sustained by a child exposed to harmful chemicals by means of her then-pregnant mother's direct contact with those chemicals at her workplace should not give rise to any different legal remedies than the same injuries suffered by a secondary exposure "mediated" by her father's contact with her mother during the gestation period.
That consideration aside, based upon the holding of Vaillancourt and the views of the Vermont Supreme Court expressed therein, this Court concludes that under Vermont law causes of action for common-law negligence and strict products liability may be asserted for an in utero injury in all circumstances, i.e, whether the tortious conduct is directed at a mother who is carrying an unborn child, or as at bar, where the harm is initially directed at the father, but through a male-mediated off-site exposure, the infant is injured in utero.
Because the law of the two States conflict as to the viability of these causes of action arising from the exposure to toxic substances in the manner involved at bar, and based upon the determination that the law of the Vermont controls in the event of such a conflict, it is that State's law which must be applied to defendants' attacks upon these claims (see, Matter of Allstate Insurance Co. [Stolarz New Jersey Mfrs. Ins. Co.], supra). Applying Vermont law, the Court agrees with plaintiff that her negligence and strict products liability causes of action do state cognizable claims (see, Vaillancourt v. Medical Center Hospital of Vermont, Inc., supra). Therefore, defendants' motions to dismiss plaintiff's negligence and strict products liability causes of action are denied.[FN15] 2. ASSUMPTION OF DUTY
Next, with respect to her assumption of duty cause of action against IBM, plaintiff argues that there is a conflict between the two States' laws as they relate to whether it is for a court or a fact-finder to determine whether a duty has been assumed. Specifically, citing Derosia v. Liberty Mutual Insurance Co. (155 Vt. 178, 583 A.2d 881 [1990]) and Pratt v. Liberty Mutual Insurance Co. (952 F.2d 667 [2d Cir. 1992]), she contends that under Vermont law the issue is left for the fact-finder to decide, while under Pfleging, that issue was determined by the court as a matter of law. Upon its consideration of the reported cases on this question offered by the parties, the Court agrees with plaintiff.
In Derosia, the parties conducted a trial on claims arising from a workplace accident. [*14]Plaintiff's liability theory was that defendant was negligent in the manner in which it conducted safety inspections at the premises of plaintiff's employer. Following the return of a plaintiff's verdict, the trial court denied defendant's motion for judgment notwithstanding the verdict or a new trial. On appeal to the Vermont Supreme Court , defendant's "central argument" was that "plaintiff failed to introduce any evidence at trial that defendant had undertaken or promised to provide safety inspection services" for either plaintiff or his employer (Derosia v. Liberty Mutual Insurance Co., supra, 155 Vt., at 182, 583 A.2d, at 883). After reviewing the law governing such claims and the proof offered at trial, that Court stated that it "disagree[d] with defendant that there was no evidence from which the jury could reasonably have concluded that defendant undertook an obligation to provide a safe workplace" (id., 155 Vt., at 186, 583 A.2d, at 885). Contrary to plaintiff's assertion at bar, Vermont's high Court did not rule "that the issue of whether or not a defendant voluntarily undertook a duty to a given plaintiff was a question of fact for the jury to decide, not a question of law for the courts" (Pl. Mem., p.16).[FN16]
Pratt, however, did reach that issue. In that case, the plaintiff's claims against her employer's workers' compensation insurance carrier were tried in a Federal District Court, under its diversity jurisdiction. On appeal, one of the issues considered was the sufficiency of plaintiff's evidence of assumption of duty. Citing Derosia, the Circuit Court determined that "the existence and scope of a defendant's duty depend on the nature and extent of its undertaking, and these, in turn, are questions of fact for the jury" (Pratt v. Liberty Mutual Insurance Co., supra, 952 F.2d, at 671).
As viewed by defendants, however, neither of these cases supports a conclusion that the two States' laws conflict as to this cause of action. Moreover, relying upon two other reported cases involving assumption of duty claims, they contend that Vermont Courts have treated the issue as one of law.
In defendants' first cited case, Andrew v. State (165 Vt. 252, 682 A.2d 1387 [1996]), in another workplace tort case in which the plaintiff claimed that the defendant negligently conducted a safety inspection, the Vermont Supreme Court held that the injured plaintiff had failed to prove his assumption of duty cause of action because the "threshold requirement that there be an undertaking of services is not met here, as a matter of law" (id., 165 Vt., at 260, 682 A.2d, at 1392 [emphasis added]). So too, in Lafond v. Department of Social & Rehabilitation Services, 167 Vt. 407,414-415, 708 A.2d 919,923 [1998]), that same Court ruled as a matter of law that the plaintiffs had failed to establish that the defendant had assumed a duty to them to properly inspect a daycare facility at which their child died in an accident. In sum, it is defendants' position that these cases support the conclusion that, at best, Vermont's law is unsettled with respect to whether the existence of an assumed duty is an issue to be determined by a fact-finder or may be decided by a court as a matter of law.
Finally, citing Rubin v. Town of Poultney (168 Vt. 624, 721 A.2d 504 [1998]), defendants maintain that this question has, in fact, not yet been ruled upon by the Vermont Courts. In Rubin, plaintiff sued to recover damages for injuries sustained by her when she was bitten by a homeowner's dog after the municipal defendant had received certain complaints about the dog. On appeal from the trial court's dismissal of the complaint on a summary judgment [*15]motion, plaintiff argued that "defendants assumed a duty to her by undertaking actions not otherwise required of them", and that "the trial court erred because the existence and scope of a voluntarily undertaken duty is a question of fact that must be submitted to a jury" (id., 168 Vt., at 625,626, 721 A.2d, at 506-507). Acknowledging that this had been held to be the rule by the Pratt Court based upon its reliance on Derosia, Vermont's highest Court declared that: "We need not reach that issue in this case because plaintiff did not come forward with sufficient evidence that defendants undertook to control the ... dog for the question to reach a jury" (id., 168 Vt., at 626, 721 A.2d, at 507 [emphasis added]).
Although facially appealing, defendants' position is not persuasive, for two reasons. First, both Andrew and Lafond may be read as cases where a regulatory enforcement scheme was found not to be an undertaking of services to employers or their workers, and thus one which did not create a duty that could be assumed by the defendants in those actions, which differs from a determination that no duty was owed by defendants, as held by the Pfleging Court. Second, while Rubin did not reach the issue of whether the fact-finder or court rules upon the existence of an assumed duty, its consideration of the sufficiency of the plaintiff's proof in that case, like the similar consideration of the evidentiary showing made by the plaintiff in Derosia, lend substantial support to the Pratt Court's holding that the issue is one of fact. Because it is persuaded that under Vermont law it is for the fact-finder to decide whether an assumed duty has been proven, and not one for the Court to rule upon as a matter of law, as was done in Pfleging, this Court agrees with plaintiff that she has demonstrated the existence of a conflict in the laws of Vermont and New York on this issue, thereby requiring that Vermont law be applied.
Turning, then, to the merits of IBM's attack upon this cause of action, it is that defendant's position that if an assumption of duty claim is in this case, it must be dismissed based upon the Pfleging holding, and because plaintiff has not properly alleged nor adequately proved this cause of action under the standards applied to such a claim in this State. Since New York law does not control with respect to this cause of action, IBM's arguments are without relevance, and offer no basis for dismissal for failure to state a cause of action or for summary judgment in IBM's favor. Accordingly, the Court denies IBM's motion for dismissal of plaintiff's assumption of duty cause of action under both CPLR 3211(a)(7) and CPLR 3212.
3. OTHER CLAIMSPlaintiff's other causes of action are those asserted against all defendants for breach of warranty and enterprise liability, and the ultrahazardous activity cause of action against IBM only. Notwithstanding that it is plaintiff's burden to prove the conflicting law of the State of Vermont, she has offered no showing whatsoever of that State's law as it relates to any of these three causes of action. Accordingly, in determining whether these causes of action survive defendants' motions, this Court applies New York's law in general, and Pfleging in particular, on the assumption that it is the same as the law of Vermont (Brandstetter v. USAA Casualty Insurance Co., supra, 163 A.D.2d, at 350).[FN17]
[*16]a. BREACH OF WARRANTY
Asserted against all defendants, plaintiff's breach of warranty cause of action is attacked by each of them for failure to state a cause of action. In addition, IBM seeks dismissal of that claim on the summary judgment branch of its motion.
As an initial matter, plaintiff does not challenge IBM's contention that in this State, a breach of warranty claim requires a sale of the defective product (see, Coutu v. Otis Elevator Co., 58 A.D.2d 131,132 [3d Dept. 1977], appeal dismissed 43 N.Y.2d 714 [1977]). Nor, in the face of IBM's evidence that it did not sell any of the causation chemicals as to which plaintiff seeks to cast it in liability, has plaintiff met her summary judgment motion burden by coming forth with any evidence sufficient to raise an issue of fact requiring a trial of this claim against IBM (see, generally, Zuckerman v. City of New York, 49 N.Y.2d 557,562 [1980]). On this basis alone, IBM is entitled to summary judgment dismissing plaintiff's breach of warranty cause of action.
Collectively, all defendants argue that the dismissal of Ms. Pfleging's strict products liability causes of action requires dismissal of the breach of warranty claim asserted by plaintiff at bar in view of the similarity of the elements of these two types of claims. Because plaintiff has failed to address this attack upon this claim, and based upon the "high degree of overlap between the substantive aspects of the two causes of action" (Denny v. Ford Motor Co., 87 N.Y. 2d 248,256 [1995]), plaintiff's breach of warranty claim against all defendants is dismissed for failure to state a cognizable cause of action under the laws of this State.[FN18]
b. ULTRAHAZARDOUS ACTIVITY
IBM attacks plaintiff's ultrahazardous activity cause of action on the ground that it cannot survive the Pfleging holding that male-mediated off-site in utero exposures fail to state a strict products liability cause of action. Because "strict liability treatment may be appropriate" to an ultrahazardous activity claim (Doundoulakis v. Town of Hempstead, 42 N.Y.2d 440,449 [1977]), and in view of plaintiff's failure to address IBM's attack upon this claim, it is dismissed for failure to state a cause of action.
[*17]c. ENTERPRISE LIABILITY
Finally, as noted, Justice Nicolai previously observed that a cause of action for enterprise liability has not been recognized in this State (see, Centrone v. C. Schmidt & Sons, Inc., 114 Misc.2d 840,845 [Sup. Ct. Nassau Co. 1982), and for that reason ruled that if plaintiff is to state a cause of action with respect to her claims of conspiratorial action involving defendants, it would have to be one of "concert of action". But for a claim of concert of action to be adequately stated and established, there must be allegations and proof that "each defendant ... acted tortiously and that one of the defendants committed an act in pursuance of the agreement which constitutes a tort" (Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289,295 [1992] [emphasis added]). Relying upon Pfleging, which they interpret as undermining each of plaintiff's other tort claims, defendants contend that an underlying tort cannot be established, thereby requiring that her concert of action claim be dismissed.
Certainly, if each of plaintiff's other claims was dismissed on these motions, there would be no underlying tort to support this cause of action (Small v. Lorillard Tobacco Co., Inc., 94 N.Y.2d 43,57 [1999] [Concert of action claim fails where there is no independent tort]). Here, however, this Court has determined that upon the application of Vermont law, plaintiff's causes of action for common-law negligence, strict products liability and assumption of duty are not subject to dismissal. Therefore, defendants' argument fails to provide a basis for dismissal of this claim.[FN19]
III. CONCLUSION
In this case the infant plaintiff has asserted several causes of action based upon a liability theory which, in New York, would likely not be viable following the decision of the Appellate Division in Pfleging. Nevertheless, because certain of her claims are valid under the applicable law of the State of Vermont, they survive the present attempt by defendants to defeat them without further proceedings.[FN20]
[*18]
WHEREFORE, IT IS
ORDERED that defendants' motions are granted to the extent that the causes of action for breach of warranty and concert of action asserted against defendants International Business Machines Corporation, Shipley Company LLC, Union Carbide Corporation, KTI Chemicals Inc., CNA Holdings, Inc. f/k/a Hoechst Celanese Corporation and G.J. Chemical Company by plaintiff Ashley Thibault in the complaint filed in this action are dismissed; and it is further
ORDERED that the motion of defendant International Business Machines Corporation is granted to the extent that the cause of action for ultrahazardous activity asserted against it by plaintiff Ashley Thibault in the complaint filed in this action is dismissed; and it is further
ORDERED that the motions of defendants are in all other respects denied.
DATED: March 25, 2004
ENTERED: S/ 
 JOAN B. LEFKOWITZ, J.S.C.
Decision Date: March 25, 2004
Footnotes

Footnote 1: The following papers numbered 1 to 140 were read on these motions for summary judgment dismissing the complaint and dismissal for failure to state a cause of action.

 PAPERS NUMBERED
Notice of Motion/Affidavit/Memorandum of Law/Exhibits A-K (Supplier Defendants) 1-14
Notice of Motion/Affirmation/Memorandum of Law/Exhibits 1-24 (IBM) 15-41
Affidavit/Memorandum of Law in Opposition/Exhibits 1-87 (Plaintiffs) 42-130 
Reply Affidavit/Memorandum of Law/Exhibits A-B (Supplier Defendants) 131-134
Reply Affirmation/Memorandum of Law/Exhibits 1-4 (IBM) 135-140 

Footnote 2: Conversely, plaintiff's breach of warranty, enterprise liability and ultrahazardous activity causes of action are dismissed upon application of this State's law, as discussed below.

Footnote 3: The facts related to the manner of plaintiff's exposure to the causation chemicals and the resulting harm to her are taken from plaintiff's papers in opposition to defendants' motions. Because the dismissal relief sought by defendants is based primarily upon a failure to state any recognized cause of action, the Court accepts plaintiff's factual claims as true for the purpose of deciding the issues raised by the parties (Leon v. Martinez, 84 N.Y.2d 83,87 [1994] [On a CPLR 3211[a][7] dismissal motion the court "accept[s] the facts as alleged in the complaint as true"]). 

Footnote 4: Plaintiff's condition is described as follows:
"Ashley's profound brain damage has required many hospital admissions as well as many surgeries and other medical procedures on both an emergent and nonemergent basis, including the placement of ventriculoperitoneal shunt system, and numerous repairs and/or revisions of the ventriculoperitoneal shunt. She needs constant medical monitoring and follow-up, a daily medication regimin, and hormone replacement therapy, with daily as well as supplementary injections. She requires incessant adult supervision, and is unable to function independently in the community. Ashley will never be able to care for herself and will require life-long medical attention and assistance." (Pl. Mem., p.10-11 [internal citations omitted]).

Footnote 5: Although there were many other companies originally named as Supplier Defendants, only those identified above remain as defendants in this plaintiff's lawsuit.

Footnote 6: Ms. Pfleging only sought to amend her complaint as it related to IBM. For that reason, the other defendants were not involved in the motion practice or the subsequent appeal.

Footnote 7: Since this analysis turns solely upon the application of the October 1998 Order to plaintiff's complaint, no conflict of law issue is presented.

Footnote 8: Plaintiff states that this dismissal was "without prejudice to a later amendment" (Phillips Affid., p.24, n.7). A review of the 1998 Order provides no support for the view that the dismissal was without prejudice. Moreover, even if the possibility of an amendment was contemplated by Justice Nicolai, no application to amend is before this Court. Consequently, there is no doubt that plaintiff's fraud claims are no longer extant in this case.

Footnote 9: Although plaintiff has stated a claim for failure to warn, for the purposes of these motions it is treated as part of her strict products liability cause of action (see, Voss v. Black & Decker Manufacturing Co., 59 N.Y.2d 102,106-107 [1983] ["As the law of strict products liability has developed in New York, a plaintiff may assert that the product is defective because of a mistake in the manufacturing process or because of an improper design or because the manufacturer failed to provide adequate warnings regarding the use of the product"][internal citations omitted, emphasis added]). 

Footnote 10: As defendants correctly assert, in denying their motion to dismiss this cause of action in 1998, Justice Nicolai noted that if the plaintiffs in this litigation have a cause of action of this type, it will of necessity be based upon a "concerted action liability theory" (Reidy Affid., Exh.D, p.16). Thus, in their papers defendants' attack is addressed to a showing that no claim for concerted action has been stated.

Footnote 11: For the purposes of this motion, the Court treats plaintiff's allegations of "abnormally dangerous" and "ultrahazardous" activity as a single claim. No party has argued that these terms represent separate causes of action or are to be evaluated by different standards.

Footnote 12: In addition to relying upon "interest analysis", plaintiff contends that under the Neumeier rules (Neumeier v. Kuehner, 31 N.Y.2d 121,128 [1972]), Vermont's law is to be applied at bar. If the liability issues raised by defendants' motions involved "conflicting rules relate[d] to allocating losses that result from admittedly tortious conduct", the Court would agree with plaintiff that the Neumeier rules would be applicable to the choice-of-law determination (see, Schultz v. Boy Scouts of America, Inc., supra, 65 N.Y.2d, at 198). In that instance, applying those rules, the Court would initially determine the respective domiciles of the parties. Here, while plaintiff is a Vermont domiciliary, at least one of the defendants, i.e., IBM, is domiciled in New York, because that is where its principal place of business is located (Dorsey v. Yantambwe, 276 A.D.2d 108,111 [4th Dept. 2000], lv. denied 96 N.Y.2d 712 [2001] ["The domicile of a corporation for choice-of-law purposes is the State where it maintains its principal place of business"]). Because the parties are domiciliaries of different states and the place of the tortious conduct is plaintiff's state of domicile, so too would the Court agree with plaintiff that under the second Neumeier rule, the law of the place of the tort would govern (Neumeier v. Kuehner, supra, 31 N.Y.2d, at 128). Nevertheless, the Neumeier analysis is without relevance since, in this case, the purportedly conflicting laws do not involve loss allocation (see, Schultz v. Boy Scouts of America, Inc., supra, 65 N.Y.2d, at 198 [Examples of loss allocating rules are ones "such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit"]). 

Footnote 13: Apart from this conflicts of law analysis, the doctrine of "law of the case" may require application of Vermont law. That doctrine "is a rule of practice, an articulation of sound policy that, when an issue is once judicially determined, that should be the end of the matter as far as Judges and courts of co-ordinate jurisdiction are concerned" (Martin v. City of Cohoes, 37 N.Y.2d 162,165 [1975] ). Most importantly, for the purposes of these motions, that doctrine "applies to various stages of the same litigation" (Matter of McGrath v. Gold, 36 N.Y.2d 406,413 [1975]). As noted, in this same litigation, defendants previously moved for dismissal of this plaintiff's claims for preconception tort. Among the determinations rendered by this Court in the January 2004 Order granting that motion was a ruling that based upon the grouping of contacts and interest analysis, "Vermont law applies in this case" (Reidy Affid., Exh.A, p.1). Since it was rendered on a motion in the same case, that decision, construed broadly, is arguably decisive of that same issue on the instant motion (Thomas v. Dietrick, 284 A.D.2d 325 [2d Dept. 2001][Holding that trial court erred in denying dismissal motion "as the issues decisive of the[] motion had already been litigated and decided in a prior motion in th[e] action"]; Rubenfeld v. Gambino, 289 A.D.2d 319,320 [2d Dept. 2001][Court's rejection, on prior motion for reargument, of defendant's contention that plaintiff made misrepresentations in his appellate brief, was law of the case, and was binding on subsequent dismissal motion]). This Court does not reach that issue, however, because neither plaintiff nor defendants have raised it.

Footnote 14: As explained by the Widera Court:
"The recognition of a common-law cause of action under the circumstances of this case would, in our opinion, expand traditional tort concepts beyond manageable bounds and create an almost infinite universe of potential plaintiffs." (Widera v. Ettco Wire & Cable Corp., supra, 204 A.D.2d, at 307). 

Footnote 15: In view of this determination, this Court need not, and does not, reach plaintiff's other two arguments in support of her position that a conflict of law exists, i.e., that "Vermont law directly conflicts with New York law on when a foetus is entitled to be treated as a separate legal person, with all rights that would inure to anyone else whom the law would regard as a 'person'" (Pl. Mem., p.14), and that "Vermont's Constitution, statutes and common law all reflect the strength of that State's solicitude for the unborn, and its policy of expanding, rather than contracting, legal bases for liability"(id., p.16-17). If reached, however, the Court would agree with defendants that neither of these contentions provides persuasive support for finding the existence of a conflict of laws with respect to whether plaintiff's negligence and strict products liability claims state a legally cognizable cause of action.

Footnote 16: This is quite understandable, since this issue was not presented on the appeal in Derosia.

Footnote 17: Plaintiff's effort to convince this Court that it should not apply the holding of Pfleging as to any of her causes of action, based upon several attacks lodged against that decision, is rejected. Whether meritorious or not, plaintiff's arguments may not be considered by this Court and, in fact, have been presented to the wrong tribunal. It cannot be credibly disputed that under the doctrine of stare decisis, this Court, which sits in the Second Judicial Department, must follow all precedent of the Appellate Division, Second Department, unless contrary authority from the Court of Appeals exists (Mountain View Coach Lines, Inc. v. Storms, supra, 102 A.D.2d, at 664; People v. Towndrow, supra, 187 A.D.2d, at 195). Because the Court of Appeals has yet to address the key duty issue which is involved in this case, this Court is constrained to adhere to the Pfleging decision.

Footnote 18: Additional support for this determination is found in Hansen v. Filtron Mfg. Co., Inc., 227 A.D.2d 522,523 [2d Dept. 1996], which cited Widera in its reversal of a trial court decision denying a motion by one defendant in the lawsuit which sought dismissal of the claims of one of the plaintiffs in that lawsuit. Although neither the facts alleged by that plaintiff in the complaint nor the causes of action she sued upon are set forth in the Appellate Division decision in Hansen, IBM has submitted copies of portions of the record on appeal, from which it is apparent that the dismissed claims included one for breach of warranty based, as at bar, on an alleged male-mediated off-site exposure while the injured plaintiff was in utero (Templeton Affid., Exh.24).

Footnote 19: In their reply papers, the Supplier Defendants also argue that plaintiff has failed to allege and prove the existence of an agreement among the defendants to engage in tortious conduct. This argument is not considered by the Court because it was put forth for the first time in reply papers, thereby depriving plaintiffs of the opportunity to respond to it (Ritt v. Lenox Hill Hospital, 182 A.D.2d 560,562 [1st Dept. 1992]["[T]he function of a reply affidavit is to address arguments made in opposition to the position taken by the movant and not to permit the movant to introduce new arguments in support of the motion"]).

Footnote 20: In view of this determination, the Court does not reach plaintiff's additional arguments for applying Vermont law, and in the event that it found New York law controlling on all issues, for not adhering to Pfleging because it is distinguishable from plaintiff's case, or for holding a decision on these motions in abeyance until further appellate review of the Pfleging decision. If reached, the Court would have concluded that plaintiff's additional grounds for applying Vermont law do not support such an approach and that Pfleging is not factually distinguishable from this case. Similarly, this Court would have denied the application to reserve decision on these motions until appellate review of the Pfleging decision has been completed. As a practical matter, it is questionable whether there will be any consideration of the Pfleging decision by this State's highest Court, in view of the recent Appellate Division denial of plaintiff's motion for leave to reargue, or in the alternative, leave to appeal to the Court of Appeals (Reidy Reply Affid., Exh.A). Irrespective of that practical consideration, it is settled law that "a trial court must follow the last decision of the controlling Appellate Division and it must not hold an adjudication in abeyance, or impede the course of litigation, pending a change in the law which may occur at some future date" (Miller v. Miller, 109 Misc.2d 982,983 [Sup. Ct. Suffolk Co. 1981][emphasis added]; Shulz v. State of New York, 151 Misc.2d 594,606 [Sup. Ct. Albany Co. 1992], affd. as modified on other grounds 185 A.D.2d 596 [3d Dept. 1992], appeal dismissed 81 N.Y.2d 336 [1993]; In re Weinbaum's Estate, 51 Misc.2d 538,539 [Sur. Ct. Nassau Co. 1966]).